J. R. WILLEY, Appellant, v. C. G. HITE et al., Appellees.

**FRAUDULENT CONVEYANCES:** Husband to Wife—Joint Accumulations. Evidence reviewed, and held to show (a) that the claim of the wife that she owned the proceeds used in buying the land in question was unfounded, (b) that said proceeds were the result of the joint efforts of husband and wife, and, the land being deeded to them jointly, they each owned an undivided half thereof.

**ESTOPPEL:** Wife's Property in Husband's Name—Credit Extended to Husband. A wife who permits her husband to take conveyance of her property in his own name—who thereby permits and invites the world to look upon and treat him as the owner, and thereby enables him to secure a false credit—is estopped to assert her ownership against the one deceived.

**FRAUDULENT CONVEYANCES:** Fraudulent Conveyance Which Does Not Defraud—Setting Aside—Husband and Wife. A conveyance of land, *fraudulent in fact,* will not be set aside at the instance of a creditor, when the land is already so heavily encumbered that no possible equity remained for the creditor intended to be defrauded.

DEEMER, J., dissents.

PRINCIPLE APPLIED: A husband and wife both owned an undivided half of the land. The husband, with intent to defraud his creditor and with his wife's connivance, deeded his half to her. The homestead right had never been set off. At the time of the fraudulent conveyance the land (106½ acres) was already mortgaged for $5,480. The *entire* tract was worth $10,650. The 40 acres for homestead, with buildings, were worth $7,000. The 66½ acres, without the homestead 40, were worth about $3,650. Of course the wife already owned, in her own right, one half of the 66½ acres. *Held,* the fraudulent conveyance did not, in fact, injure or hinder the creditor, and the conveyance would not be set aside.

*Appeal from Carroll District Court.—F. M. POWERS, Judge.*

THURSDAY, NOVEMBER 5, 1914.

REHEARING DENIED FRIDAY, APRIL 7, 1916.

ACTION to set aside certain conveyances claimed to have been made to defraud creditors.—*Affirmed.*

*W. C. Saul* and *B. I. Salinger,* for appellant.

*Brown McCrary* and *George G. Bowen,* for appellees.

GAYNOR, J.—On March 6, 1908, the defendants herein, C. G. Hite and M. E. Hite, his wife, purchased the land in controversy from one Joseph D. Osborne, and a deed therefor was executed to them jointly, and duly filed for record on March 12, 1908. On the 22d day of February, 1910, C. G. Hite became indebted to the plaintiff upon certain promissory notes. These notes became due February, 1911, and thereafter, on the 25th day of March, 1911, suit was brought upon them against C. G. Hite and others, and all defendants in that suit answered April 17, 1911. On the 18th day of October, 1911, judgment was entered against the defendant C. G. Hite for the full amount of said notes and costs. On the 22d day of April, 1911, C. G. Hite conveyed his interest in said property, by warranty deed, to his wife, M. E. Hite, conveying therein to her an undivided half interest in the land in controversy. On the 13th day of October, 1911, the defendant M. E. Hite, her husband joining therein, conveyed all of said land to the defendant William Bowyer. The land in controversy contains 106½ acres. At the time of the conveyance from C. G. Hite to his wife, M. E. Hite, the same was conveyed to her subject to a mortgage of $5,480. The plaintiff claims that the deed made from C. G. Hite to his wife, M. E. Hite, of an undivided one-half interest in the land in controversy, and the deed made by M. E. Hite to William Bowyer, were made

1. FRAUDULENT
CONVEYANCES:
husband to
wife: joint ac-
cumulations.

for the purpose of hindering, delaying and defrauding plaintiff in the collection of his judgment, and he brings this action to set aside those conveyances, and to subject an undivided one-half interest in the land theretofore owned by C. G. Hite to the payment of said judgment. It appears that the defendants C. G. and M. E. Hite had occupied some portion of this 106 acres as a homestead for three or four years prior to the making of these conveyances, but the homestead had never been set off or marked as such, nor was any portion of said premises set apart as a homestead at the time that this suit was commenced. The defendants herein filed separate answers. Each of the defendants deny each and every allegation of plaintiff's petition, and deny any intention to defraud the plaintiff in the making of the conveyances complained of. The Hites in their answers claim that the purchase money of the premises in question was furnished by the defendant M. E. Hite, and that without her knowledge or consent the deed of conveyance was made by Osborne in the name of both of the defendants, instead of in the name of the wife, and that the same was an error or mistake; that thereafter C. G. Hite agreed with his wife to convey the legal title of the entire premises to her. They both claim that they have lived upon these premises, in a house situated thereon, for more than four years last past; that this was their only home and homestead. They claim that they had a valid and existing homestead right therein long prior to the time that the debt was created on which judgment was rendered; that the purpose in making the deed to William Bowyer was to purchase another homestead; that the defendant C. G. Hite had a claim and homestead right in said premises at all times. The defendant Bowyer, answering the petition, denies any intention to defraud; affirms the matters set up in the answer of the other defendants and alleges that he knew of the homestead character of the land; knew the same was encumbered; knew that C. G. Hite was in poor health and should be relieved from the burden of carrying on the work of the farm; that he paid

a valuable consideration therefor in good faith; that he knew nothing of plaintiff's claim at the time that he took said conveyance. The plaintiff for reply says that, in extending the credit which made the debt on which the judgment herein sought to be enforced was rendered, the plaintiff relied upon the apparent ownership of said land in controversy, and that C. G. Hite was the owner of an undivided half interest therein, and that he extended credit to C. G. Hite in reliance thereon, and that the Hites, by permitting the same to appear of record in the name of both, are now estopped from denying that C. G. Hite was the owner of an undivided half interest therein. Upon the issues thus tendered, the court rendered judgment for the defendants, dismissing plaintiff's petition, and from this judgment, the plaintiff appeals.

It appears that the consideration named in the deed from Osborne to these defendants was $6,000; that the deed was made subject to a mortgage of $4,500. It appears that this deed was made on March 6, 1908, and conveyed the land to C. G. and M. E. Hite jointly. It appears that prior to the purchase of this land, the defendants C. G. and M. E. Hite owned certain land in Calhoun County; that the record title to it was in them jointly; that they sold this Calhoun County land, and received therefor about $3,000. It appears that $500 was paid down at the time of the purchase of the land in question from Osborne, leaving $1,000 to be paid; that the $1,000 was later paid by check made by the defendant C. G. Hite; that the check for $1,000 was signed by C. G. Hite; that both joined in the mortgage which was given to secure the balance. Defendants claim, however, that this money paid belonged to M. E. Hite. As to the Calhoun farm, they make the same claim that they make here, that, while the deed was in the name of both jointly, M. E. owned the entire property, and the proceeds that came from the sale of it. The explanation as to how she became the owner of the Calhoun County farm might convince an exceedingly credulous mind, but will not stand the test of judicial analysis. It appears from the

evidence that they had very little property when they purchased the Calhoun farm. It appears that the transaction which resulted in the purchase of the Calhoun farm was carried on entirely by C. G. Hite; that the draft for the first payment was sent by C. G. It is claimed that the contract for the Calhoun farm was made in the wife's name. The contract is not produced. The defendants claim that it had been burned or destroyed in some way, but the deed was made to them jointly. It appears that prior to, or at the time that they bought the Calhoun land, they were living on a rented farm in Carroll County. That was 13 years prior to the time that this action was tried.

M. E. Hite testified that her husband "did the dickering for the Calhoun farm;" that he bought the farm for her; that she sent him to make the contract; that the money that was paid for the Calhoun farm, she· said, was paid by her husband, but he got it by disposing of her stock. The land was bought for $25 an acre, and $200 was paid down; that the fact that the Calhoun farm was taken in the name of both, she said, was without her knowledge and consent. She said that the money she got to pay on this farm she gathered up from stock and personal property and things of that kind; that she made a small payment; that she was very poor.

In leading up to the purchase of this Calhoun County farm, the defendant M. E. Hite testifies: .

"I lived in Mahaska County four years, and before that, in Marshalltown. I had some money when we came from Marshalltown to Mahaska County. I owned a town property located in Gilman, and it was in my name. Removed from Mahaska County onto a farm in Carroll County. Rented it from Grace. When we got to Carroll County, I don't remember exactly how much stock I had, but what was there belonged to me, and he (meaning her husband) had nothing but his clothes. I had my stock left, and I rented a farm. I didn't rent it personally; I let my husband do that. The lease was taken in my name. What was made on the Grace farm was

my money, excepting what it took to pay the rent. My husband had a right to work there without pay, but I didn't hire him. While we lived on the Grace farm, the land in Calhoun was bought. The negotiations resulting in the purchase were carried on by my husband. He, and not I, made the deal. The money was paid by him, but it was got by disposing of my stock. My husband had no money when the Calhoun County farm was bought. The property I took with me to Mahaska County consisted of about six head of cattle and four horses. We stayed there four years. During this time, my husband accumulated nothing, and we lost out. Didn't take much stuff with me from Mahaska County, a few horses and some cattle. We had some lean years there. Rent was high, and we didn't have anything to start with to amount to anything and we didn't make much money."

C. G. Hite, in speaking of the purchase of this Calhoun farm, says:

"We didn't make any payments in advance. Didn't make any payment when we got it. We bought it in the fall and the first payment was made in the spring following."

It appears that they lived nine years on this Calhoun County farm; that it consisted of about 80 acres. In speaking of the relationship of her husband to her and the property, which is involved in this suit, M. E. Hite said:

"My husband was my manager to run the farm for me. He did that, of course, as a husband would. He got his board and clothes; I guess he did; I don't know but what he got all he wanted to eat and wear."

C. G. Hite, testifying concerning the purchase of the property in controversy, said:

"The purchase money for it, when it was purchased four years ago, came out of the Calhoun County farm consisting of 80 acres. We got a little bit paid on the Calhoun County deal when I slipped down here and made the deal for the land in controversy. When we talked with Osborne, we had already sold the Calhoun County farm, and had received a little more

than $3,000 therefor. This was cash raised from the sale of the farm. We paid Osborne $500 at the time. Think we were to pay $1,000 later to get the deed. The $1,000 was later paid by check, by my check, signed by me. We both signed the mortgage to Osborne for the balance of the purchase price.''

He claims, however, that this was his wife's money, and bases this claim on the fact, as he says, that, notwithstanding that the Calhoun County land was held by them jointly, she was, in fact, the owner of that land and of the proceeds that went into the land in controversy.

''She frequently, after making the deed to the land in controversy, asked me to convey to her, but I suppose I was a little stubborn and wouldn't do it. I finally consented to make the deed that is drawn in question in this suit. She said it was her property. Of course, I am not as well as some people. I have heart trouble. She said, 'You know if you dropped off, the heirs will come in and rob me.' She hadn't much equity in the place and she wanted to provide for herself should something happen to me.''

M. E. Hite, touching the ownership of the land in controversy, testified:

''Of course, Osborne made the deed to us jointly, but I discovered this as soon as the deed was received. I don't know why it was made to us jointly, but I knew it was in my name and his. I made objection right away, but I allowed it to remain in that way for over three years, knowing that the record showed the title to be in us jointly. I finally got it back from my husband. I got the deed back from him because his health was poor. He had heart trouble, and I had been asking him for the last two years to give it back to me. We called a doctor, and he said he was likely to drop off any minute, so I wanted the property fixed up.''

It appears that this deed to her from her husband, for the land in controversy, was made a few days after the action which resulted in the judgment in question was commenced.

One F. F. Hunter, an attorney at Rockwell, testifying for the plaintiff, said:

"I furnished the money about the time the deal was closed for the Calhoun County land. I furnished $500. Had a mortgage on the land, subject to a mortgage of $1,600. This $1,600 mortgage ran to the party from whom the land was purchased. These mortgages were signed by both the Hites."

As to the deed from M. E. Hite to Bowyer, it appears that a short time before the deed was executed, defendant Mrs. Hite went to Bowyer, who is her son-in-law, and asked him if he wanted to buy the land; told him that she needed $2,000 in cash; that she would sell for $12,200. It appears that she told him the amount of encumbrance against it; that she would only need $2,000 in cash. She asked him if he could furnish the cash. He said that he had a friend up in the northwestern part of the state who would let him have the money. It appears that this deal with Bowyer was made just a few days before the judgment in suit was entered; that three notes were made and signed by Bowyer. These notes were signed by Mrs. Hite. No security was given for these notes. It appears that these notes were made the next day after the first conversation touching the purchase of the land; that Mrs. Hite and Bowyer went before one Wicks; that Wicks gave Mrs. Hite $2,000 for Bowyer, or Bowyer got $2,000 from Wicks and gave it to Mrs. Hite. The notes for the balance were delivered to Mrs. Hite. It appears that then a deed was executed and delivered to Bowyer, signed by Mrs. Hite alone (This was on the 13th day of October, 1911); that the next day, a new deed was drawn up, signed by the husband, C. G. Hite, in lieu of the deed made on October 13th. It appears that Bowyer had very little property. The next day, Mrs. Hite returned to Wicks the $2,000 that she had received as part payment on the land. Mrs. Hite claims that, when she went to Wicks, it was for the purpose of seeing if she could raise the money on the other notes, but that instead of selling her notes she bought the note that Bowyer had given to Wicks for

$2,000. She says she supposed that he got the money from Wicks and gave his note for it. She returned the money to Wicks the next day and took the note that Bowyer had given to Wicks for the money.

"Wicks told me that he held the note, and then I proposed to buy it. Wicks said he held my son-in-law's note payable on demand. Told me the amount was $2,000. Said it was for the $2,000 Bowyer paid me the day before. I told Wicks I didn't want to use the money, and asked him if he would sell the note and he said he would. The note was payable on demand."

Mrs. Hite testified:

"After I bought the note, I went to Bowyer and asked him if he could pay that note on demand. He said, 'I have the money promised me.'"

It appears that the notes taken for the Bowyer land are all now in the possession of Mrs. Hite, and are past due; that the Hites are still in possession of the land, and are holding it under no lease or contract with Bowyer. It does not appear that Bowyer paid anything on the notes, interest or otherwise. It does not appear that he has taken, or attempted to take, possession of the property. It affirmatively appears that the Hites have occupied it the same as before the sale, under no arrangement with Bowyer for rent or otherwise. It appears that Bowyer took the deed to this land without the husband's joining in the deed. It appears that he took Mrs. Hite's statement as to the title to the land and the encumbrance upon it. He had no abstract and asked for none. It appears that he had no money, and very little property; was a renter on a small farm; that the banker, Wicks, and the defendant, Mrs. Hite, took his notes, if their story is true, without any security's being asked for, or given; without any arrangement as to when possession of the land would or could be taken; that the next day after receiving the money she returned the same to Wicks. At best, she says it was the next day. Mr. Wicks was not a witness in this case. So it appears that this banker parted

with $2,000 to Bowyer without any security therefor, except that Bowyer was the grantee in a deed executed by the wife, in which her husband did not join. She claimed that she needed the $2,000 and had to have it, and yet she says that she returned the $2,000 the next day because she preferred a note, on demand, that would draw interest. Then she immediately proceeded to ask Bowyer whether he could pay the note on demand, and he told her that he could because Lilly had promised him the money.

There is more testimony bearing upon these questions, but we think that this is sufficient to show the trend of the transaction, and, from the whole record, we reach the conclusion that the consideration in the Calhoun County land was the product of the joint efforts of these defendants, and that the unpaid purchase price was secured by their joint obligations; that the proceeds received from the sale of the Calhoun County property was the joint property of these defendants; that the same represents the consideration paid Osborne for the land in controversy, except such deferred payments as were secured by their joint obligations. We find, therefore, that at the time the deed was made by Mrs. Hite to her husband, who owned an undivided one-half interest in the land, the sale made by him to her was without consideration, and was made by him after he had been served with notice of the commencement of the suit that resulted in this judgment, and was made for the purpose of avoiding his obligations to the plaintiff. Though there is no direct proof upon the point, we are satisfied from the whole record, and from the conduct of the other defendant, Mrs. Hite, that she knew of his purpose and intent, and received the conveyance from him for the purpose of aiding him in carrying out his intent to defraud.

As to the conveyance to Bowyer, we find from the whole record, from the haste with which it was carried on, the manner in which it was carried on, that it was made in furtherance of the same scheme and purpose, and purely colorable to that end; that no valid consideration passed, in fact, from Bowyer

to her for the deed; that the passing of the money from Bowyer to her, through Wicks, and the return of the money by her to Wicks, was only a colorable transaction, carried on between them, to the end that it might be made to appear that Bowyer had paid to her a valuable consideration for the land.

It is next contended that the defendant M. E. Hite, having permitted the title to an undivided half interest in the land to remain in the name of her husband, C. G. Hite, and credit having been extended to him upon the

2. ESTOPPEL: wife's property in husband's name: credit extended to husband.

strength of his apparent ownership, it is inequitable to allow her to assert that he had no interest therein as against those who, in extending credit, relied upon his apparent ownership.

The plaintiff testified that he would not have taken the notes, or parted with his property for which the notes were given, had not the signature of C. G. Hite been on the note, and had he not believed that the land standing on the records in Carroll County belonged to him. The notes were given by W. C. Hite for stock and machinery, and C. G. Hite signed them as surety. Plaintiff testifies:

"I understood at the time I accepted the notes that C. G. Hite had 106 acres of land in Carroll County with about $5,000 against it."

Upon this branch of the case, we find the fact to be that the plaintiff did extend credit to the signature of C. G. Hite, in reliance upon his apparent ownership of an undivided half interest in the property in controversy, and that she is now estopped to assert a claim to the entire property as against the creditors of her husband. In *Lyman v. Cessford*, 15 Iowa 229, we find this doctrine affirmed. See, also, *White v. Morgan*, 42 Iowa 113.,

In *Langford v. Thurlby*, 60 Iowa 105, 107, this court used the following language:

"We have, then, the common case of a husband and wife acquiring property by their joint industry and management,

with all the property in the husband's name, and a conveyance thereof, without consideration to the wife, to the prejudice of existing creditors of the husband. This is what the courts everywhere denominate a voluntary conveyance, and it cannot be upheld."

As bearing upon this same question, see *Citizens' Savings Bank v. Glick*, 134 Iowa 323. In *Culver v. Graham* (Wyo.), 21 Pac. 694, quoting from and approving what was said in *Besson v. Eveland*, 26 N. J. Equity 468, 472, the court said:

" 'Claims of this kind should always be regarded with a watchful suspicion, and when attempted to be asserted against creditors upon the evidence of the parties themselves, uncorroborated by other proof, they should be rejected at once, unless their statements are so full, clear and convincing as to make the justice and fairness of the claim manifest. Any other course will encourage fraud, and multiply the hazards of most business ventures.' . . . But, even on the assumption that the testimony removed all reasonable doubt of her payment of the consideration, we do not perceive how the trust could avail her in this action. Married women, with all the disabilities of coverture which are imposed by the common law, may, under diverse circumstances, be estopped from asserting their rights, either of property, of control, or of remedy, although such rights may primarily have clearly existed. To borrow the familiar phrase, her coverture was intended to be used as a shield, never as a sword. For much stronger reason may the doctrine of estoppel be applied within those jurisdictions where their property is freed from the control of their husbands, and they, by legislation, have been made persons *sui juris*."

The intent with which the conveyance was made is to be ascertained from the facts and circumstances attending the conveyance. It is not to be expected that they will voluntarily confess their guilty design in the courts. It is presumed rather that they would deny it. We look then to the facts

and circumstances attending the whole transaction to ascertain the fact.

In *Iseminger v. Criswell,* 98 Iowa 382, 386, we find this question discussed. In that case, the court said:

"Was the wife the beneficial owner of the land at the time the conveyance was made, and was the title transferred to her in execution of a trust implied by law by reason of the wife's having furnished the consideration for the property? The presumption is that the husband was the equitable as well as the legal owner of the land, for the title stood in his name, and no declaration of trust appeared in the conveyance. The burden was and is, therefore, upon the appellee to establish her claim that it was her money which purchased the . . . land, and that it was the intention of the parties that she should have the beneficial interest therein; and this she must do by clear and satisfactory evidence. . . . But aside from all this, it clearly appears that the appellant believed, when he loaned the defendant . . . the money, which loan was the basis of his judgment, that he (the husband) owned the land, and that, if he had had any notice or knowledge of appellee's equitable claim therein, he would not have loaned the same. . . . Under such a state of facts, it would be most inequitable to permit the appellee to hold the land. Her acquiescence and laches, as well as her implied consent to the ostensible ownership of the land by her husband, ought to estop her from now claiming title."

See cases therein cited.

So in this case, we hold that even if it be a fact, as claimed by Mrs. Hite, that she furnished the money that made all the payments upon this land in controversy, yet she, having permitted the title to an undivided half to remain in her husband, and the plaintiff having extended credit upon his apparent ownership, is now estopped to assert her claim as against the plaintiff's judgment.

It is next contended that, even if it be true that the con-

veyances complained of were made with fraudulent intent, yet the plaintiff is not entitled to the relief demanded, for the reason that the property sought to be subjected to plaintiff's claim, after allowing to the defendant C. G. Hite a homestead interest therein, is already encumbered for more than it is worth, and that therefore, by the conveyance, no fraud was perpetrated in fact, injuriously affecting the rights of this plaintiff; that the mere intent to defraud, where no fraud was, in fact, perpetrated, will not justify the court in setting aside the conveyance, and reliance is had to support this proposition upon *Aultman, Miller & Co. v. Heiney,* 59 Iowa 654; *Veeder v. Veeder,* 141 Iowa 492.

3. FRAUDULENT CONVEYANCES: fraudulent conveyance which does not defraud: setting aside: husband and wife.

This court, in *Aultman, Miller & Co. v. Heiney, supra,* said:

"Whatever may be the intent of a conveyance, it cannot be set aside as in fraud of creditors, unless it does, in fact, hinder or delay them in collecting their debts."

This opinion is predicated upon the rule laid down by the Supreme Court of Minnesota in *Baldwin v. O'Laughlin,* 11 N. W. 77. The doctrine of this case was reaffirmed in *Veeder v. Veeder,* 141 Iowa, at 495, in which this court again said:

"If the conveyance did not, in fact, hinder or delay creditors, it was not fraudulent as to them."

In *Baxter v. Pritchard,* 113 Iowa 422, this court said:

"We think it clear that the encumbrances more than equalled the value of the land, and therefore no intent to defraud is shown."

In *Goddard & Sons v. Guittar,* 80 Iowa 129, this same doctrine is affirmed. It seems to be the doctrine of this state that no creditor is entitled to have a conveyance set aside on the ground that it was executed with fraudulent intent, when it affirmatively appears that he was not prejudiced by the act complained of as constituting the fraud.

In the case of *Mittleburg v. Harrison* (Mo.), 3 S. W. 203, that court said, among other things, in discussing this question:

"It is contended by counsel for appellant that the judgment creditor has a right to subject the property of his debtor to sale; that it lies in no one's mouth to say that that property is worthless; that the creditor may have some special use for it, and may be willing to bid it in at execution sale, and has a right to his opportunity of doing so."

Without disposing of the case upon this issue, that court said:

"Courts take a practical view of all matters. We are not to be understood as intimating that, even had plaintiff been a creditor of Magwire at the date of the conveyance, a court of equity, under the evidence in this case, would have been bound to sustain this bill for the purpose of placing in the hands of plaintiff a barren power of bidding in this equity of redemption, to the annoyance of defendant, and without any reasonable probability of pecuniary benefit to plaintiff."

The Supreme Court of Minnesota, in *Baldwin, Admx., v. O'Laughlin*, 11 N. W. 77, said that, to make a debtor's transfer of property fraudulent as respects his creditors, there must be an attempt to defraud, express or implied, and an act, which, if allowed to stand, will actually defraud them by hindering, delaying or preventing the collection of their claims.

"The fact that the debtor mistakenly supposes or hopes that, in conveying his encumbered property, he has secretly covered up and saved something for himself, from which he designs and endeavors to exclude his creditors, does not make his conveyance fraudulent. If, notwithstanding his hopes, suppositions, and intent, it is beyond question that the encumbrances exceed the value of property, so that there is nothing left for him to cover up and save, and nothing from which to exclude his creditors, they are not injured or defrauded," and, therefore, cannot have the conveyance set aside. "Whatever may be the debtor's intent, where there is no act which

will have this effect, the creditor is not damaged or defrauded.''

This doctrine was reaffirmed by that court in *Aultman & Taylor Co. v. Dalen* (Minn.), 58 N. W. 551. It is true that, in this last case, Judge Canty, of that court, dissented, and it is also true that Chief Justice Stark, of the same court, in the case of *Fryberger v. Berven* (Minn.), 92 N. W. 1125, a case in which a similar question was raised, recognizes the same doctrine, but raised a question as to whether it was legally or ethically sound.

In the case of *Sims v. Gaines*, 64 Ala. 392, that court seems to hold to a different doctrine from that announced here.

In Bump on Fraudulent Conveyances (4th Ed.), Sec. 215, p. 250, the doctrine is announced that if a transfer is fraudulent the grantee cannot retain the property on the ground that it is of no value, and cites in support of that statement *Garrison v. Monaghan*, 33 Pa. 232, and *Hanby v. Logan*, 1 Duvall (Ky.) 242. On examination of these cases, however, we find that they do not fully support the text, if applied to the facts in this case and the proposition here under consideration.

It may be contended that there was, in said property, an inequitable right of redemption, on the part of the Hites, of which plaintiff herein might avail himself in the event that the conveyances herein complained of were set aside, but it is not apparent to us that such a right has any substantial value, under the conditions shown to exist in this case. It would be a barren right to redeem property from an encumbrance far exceeding its value, as shown by this record. Before a court of equity will intervene, it must be shown that the plaintiff, seeking to have the conveyance set aside, has not only a substantial, but a valuable and present, right to be protected by a decree of the court. This reaches far into the field of speculation. The rights of these parties are to be judged by the conditions existing at the time that this cause was tried, and as

they appear in this record, and the court will not enter into speculation as to possible conditions that might arise, but are not shown to exist in this record.

It is true that the land in controversy was held jointly by defendant C. G. Hite and his wife. The record shows that they had occupied a certain portion of the land as a homestead. It appears, however, that this homestead was never marked off or designated. Under the law, however, they were entitled to 40 acres, and the defendant had a right, if he so elected, to have the same set off and marked as such. This homestead, of course, was exempt from execution, and could only be taken for the mortgage, after the other property mortgaged had been exhausted. The property was mortgaged, at the time that this conveyance was made, for $5,480. These mortgages covered the entire land. There remained then 66½ acres, subject to this mortgage, outside the homestead in which Mrs. Hite had an undivided half interest. The evidence shows that the entire tract, including the homestead, was worth not to exceed $100 an acre. It appears that this 66½ acres, separated from the homestead where the buildings are, was not worth to exceed $55 an acre.

There is testimony that the homestead, including the buildings thereon, was worth $175 an acre. The evidence tends to show that there were good improvements upon the portion of the land occupied by the defendants as the homestead. Deducting the value of the homestead from the value of the land as a whole, it would appear that there was insufficient to pay even the mortgage debt. Figuring the land separate and distinct from the homestead, as estimated by the witnesses, it would still appear that there was insufficient to pay the mortgage debt. It would, therefore, appear from this record that the plaintiff was not prejudiced, and no fraud was perpetrated upon him by the conveyance. Therefore, under the rule laid down in the cases above cited, we think that the judgment of the court ought to be affirmed, and is—*Affirmed.*

EVANS, C. J., LADD, WEAVER, PRESTON and WITHROW, JJ., concur.

DEEMER, J. (dissenting)—Although concurring in the finding of fraud, I cannot agree to the conclusion of the majority that plaintiff is not entitled to relief. As a judgment creditor, plaintiff had the right to ignore the fraudulent conveyances, to levy upon and sell the land non-homestead in character, secure a deed thereto, and then bring action for possession, to set aside the fraudulent conveyances, and to quiet his title as against all the defendants, or to proceed in equity by 'creditors' bill to remove the cloud, set aside the fraudulent conveyances, and to sell the land under either general or special execution. He chose the latter course, and, notwithstanding a finding that the conveyances were actually fraudulent, and made with intent to hinder, delay and defraud creditors, plaintiff is defeated because certain witnesses have testified that, taking out the homestead, nothing of value remained; and plaintiff should not be allowed to harass the fraudulent actors in these transactions.

Personally, I do not think that these parties, who are confessedly guilty of actual and deliberate fraud, are entitled to much consideration at the hands of any court; nor do I believe that either law or equity will lend them any assistance. These conveyances, being fraudulent in character, were as if never made. If defendants Hite still owned the land, and there had never been any conveyances to defraud creditors, no one would hold, I think, that plaintiff, a judgment creditor, could not have levied upon and sold the land, or defendant C. G. Hite's interest therein, and neither he nor the other encumbrancers could have been heard to say that the property had no value. That was a matter in which plaintiff had the right to take his chances. If he were willing to chance it, neither the judgment debtor nor any of his creditors could suffer, and, if there was anything of value in the property, plaintiff had the right to subject it to the payment of his

judgment, and in so doing had the unquestioned right to speculate on the future. This being true, does it lie in the mouth of the defendants, who entered into an arrangement to defraud plaintiff, to say that plaintiff was not in fact defrauded, because there was nothing of value in the land? I think not. To permit plaintiff to set aside these fraudulent conveyances and to sell the land subject to the encumbrances would harm no one. As it is, the fraudulent grantees may at least hold possession of the land, and enjoy the rents and profits so long as the encumbrancers see fit to permit them to do so; and this right would continue for at least one year from the time they sold the land; for the defendants, or some of them, would have that long a time in which to retain possession and to redeem. Moreover, we have expressly held that the equity of redemption in land, or the right to possession until the equity of redemption is cut off by proper proceedings, is subject to levy and sale. *Barnes v. Cavanagh,* 53 Iowa 27; *Sheehy v. Scott,* 128 Iowa 551; *Thomassen v. De Goey,* 133 Iowa 278; *Crosby v. Elkader Lodge No. 72,* 16 Iowa 399; *Curtis v. Millard & Co.,* 14 Iowa 128; *Kendig v. McCall,* 133 Iowa 180.

None of the encumbrancers of the land have taken any action to foreclose or cut off the equity of redemption, and the fraudulent grantors, or their grantees, are in the undisputed possession of the land, and enjoying its rents and profits. This they have a right to do, until their equities are fully cut off by proper proceedings against them. These may be indefinitely deferred, and yet it is said there is nothing in the land which plaintiff may sell. I cannot see the logic of this position in view of our previous holdings regarding the right to sell an equity of redemption. That it is worth something, and that plaintiff has the right to subject it to his judgment, I have no doubt.

The textbooks, and what I regard as the weight of authority, are with me on these propositions. See Wait on Fraudulent Conveyances (2d Ed.), Sec. 31; Bump, Fraudulent Con-

veyances (4th Ed.), Sec. 215; *Sims v. Gaines,* 64 Ala. 395; *Fassit v. Phillips,* 4 Whart. (Pa.) 399; *Mittleburg v. Harrison* (Mo.), 3 S. W. 203.

The fact that a fraudulent conveyance has been made of this equity of redemption in no manner changes the rule. I do not relish the idea that parties guilty of actual fraud, or of an intent to defraud, may still hold possession of land, take its rents and profits, and say to a judgment creditor whom they intended to defraud:

"True we did all these things, still have possession of the land and the enjoyment thereof, yet, as the land is already encumbered for all it is worth, you whom we intended to defraud have no right to disturb or harass us."

In my judgment it was for plaintiff to say whether he cared to go ahead and take his chances on getting something out of the land. He unquestionably had the right to speculate upon a rise in value or upon any other adventitious fact or circumstance.

I would reverse the judgment.